UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KRISTINE FERRARA, | No. 3:20-cv-00394 (KAD) |
| *Plaintiff*, | |
| v. | |
| ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY, | April 2, 2021 |
| *Defendant*. | |

**MEMORANDUM OF DECISION RE: PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER (ECF NO. 16) AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (ECF NO. 17)**

Kari A. Dooley, United States District Judge:

Kristine Ferrara (the "Plaintiff") brings this administrative appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). She appeals the decision of Defendant Andrew M. Saul, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act") as well as her application for supplemental security income benefits ("SSI") pursuant to Title XVI of the Act. Plaintiff moves to reverse the Commissioner's decision or, in the alternative, to remand the case to the agency based on the alleged failures of the Administrative Law Judge ("ALJ") to: (1) develop the record adequately after declining to consider as persuasive evidence the opinion of any examining physician; and (2) determine properly the Plaintiff's residual functional capacity. The Commissioner opposes the Plaintiff's claims of error and moves to affirm his decision. For the reasons set forth below, the Plaintiff's motion to reverse is DENIED and the Commissioner's motion to affirm is GRANTED.

**Standard of Review**

A person is "disabled" under the Act if that person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(a); 1382c(a)(3)(A).  A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* §§ 423(d)(3); 1382c(a)(3)(D).  In addition, a claimant must establish that his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* §§ 423(d)(2)(A); 1382c(a)(3)(B).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Act's definition of disability.  *See* 20 C.F.R. § 404.1520.  In brief, the five steps are as follows: (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has "a severe medically determinable physical or mental impairment" or combination thereof that "must have lasted or must be expected to last for a continuous period of at least 12 months;" (3)  if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform

his past relevant work; and (5) if the claimant is unable to perform his past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of his RFC and his education, age, and work experience. *Id.* §§ 404.1520(a)(4)(i)-(v); 404.1509.  The claimant bears the burden of proof with respect to Step One through Step Four, while the Commissioner bears the burden of proof as to Step Five. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

It is well-settled that a district court will reverse the decision of the Commissioner only when it is based upon legal error or when it is not supported by substantial evidence in the record. *See, e.g.*, *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (*per curiam*); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotations marks and citation omitted). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (*per curiam*) (quotation marks and citation omitted). "Under this standard of review, absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 448 (D. Conn. 2009). The court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Social Sec.*, 692 F.3d 118, 122 (2d Cir. 2012), and can only reject the Commissioner's findings of fact "if a reasonable factfinder would *have to conclude otherwise*," *Brault v. Social Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (*per*

*curiam*) (quotation marks and citation omitted).  Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld."  *Selian*, 708 F.3d at 417.

**Procedural History**

On September 20 and 22, 2017, Plaintiff filed applications for SSI and DIB pursuant to Title XVI and II of the Act, respectively, alleging an onset date of March 15, 2017.  (*See* Tr. 252, 261.)  The claims were denied initially on January 11, 2018 (Tr. 101–02) and on reconsideration on May 22, 2018.  (Tr. 135–36.)  A hearing was thereafter conducted before ALJ Matthew Kuperstein on December 13, 2018.  (*See* Tr. 32.)  On February 22, 2019, ALJ Kuperstein issued a written decision denying Plaintiff's applications for DIB and SSI.  (*See* Tr. 7–23.)

In his decision, ALJ Kuperstein followed the sequential evaluation process for assessing disability claims.  At Step One, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the alleged onset date of her disability.  (Tr. 12.)  At Step Two, the ALJ determined that Plaintiff has severe medically determinable impairments consisting of "peripheral neuropathy, obesity, history of bilateral shoulder arthroscopy, anxiety disorder, affective disorder, restless leg syndrome, [and] complex regional pain syndrome," which significantly limit her ability to perform basic work activities.  (Tr. 12–13.)  The ALJ also concluded that Plaintiff has non-severe impairments consisting of pleural effusion, neurocognitive disorder, and migraine headaches.  (Tr. 13.)  The ALJ further noted that Plaintiff reportedly suffered from a torn rotator cuff and rotator cuff tendinitis/tendonosis but the ALJ did not find this to be a medically determinable impairment given the absence of corresponding medical evidence.  (Tr. 13.)  At Step Three, the ALJ concluded that none of Plaintiff's severe impairments met or medically equaled a listed impairment in Subpart P, Appendix 1 at 20 C.F.R. Part 404.  (Tr. 13–14.)  At Step Four, the ALJ determined that Plaintiff

> has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following limitations: to only occasional

4

>climbing of ramps or stairs, crouching, or crawling; to never climbing ladders, ropes, or scaffolds; to only frequent balancing, stooping, or kneeling; to only occasional bilateral upper extremity overhead reaching; and to needing to be able to avoid even moderate exposure to hazards such as machinery or heights; to work that involves remembering and comprehending simple work-related directives, to engaging in simple tasks that do not demand intense sustained focus, and to work that does not involve interaction with the public and only occasional interaction with coworkers and work that does not require teamwork or the collaborative work activities with coworkers.

(Tr. 14.)  At Step Five, the ALJ concluded that Plaintiff was unable to perform her past relevant work as a manicurist, receptionist, or file clerk.  (Tr. 20–21.)  Nonetheless, the ALJ held at Step Five that in considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform, such as a laundry folder, price marker, or package sorter.  (Tr. 21–22.)  ALJ Kuperstein therefore deemed Plaintiff not disabled within the meaning of the Act.

On January 28, 2020 the Appeals Council denied Plaintiff's request for review, rendering final the ALJ's decision.  (Tr. 1.)  This appeal followed.

**Discussion**

In her motion to reverse or, in the alternative, to remand, the Plaintiff argues that the ALJ erred at Step Four in finding the opinions of consultative examiners Jeffrey Cohen, Ph.D. and Ruth Grant, Ph.D. unpersuasive and that the record accordingly lacks reliable medical opinion evidence to support the ALJ's RFC determination.  She further challenges the ALJ's formulation of the RFC as failing to account for additional limitations consisting of her off-task behavior and absenteeism, need to avoid coworker interaction, and use of a cane for stabilization.  "An RFC finding is the most an individual can do despite his or her impairments, and the plaintiff bears the burden of demonstrating that her functional limitations preclude any substantial gainful work."  *Matteo v. Berryhill*, No. 3:17-CV-1821 (RMS), 2019 WL 644828, at *8 (D. Conn. Feb. 15, 2019) (internal citation omitted).  The Plaintiff's arguments are addressed in turn.

**Medical Opinion Evidence**

On January 18, 2017, the Social Security Administration promulgated new rules that significantly change the way that the Commissioner considers medical opinion evidence and that were made effective March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Opinion Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The new regulations, 20 C.F.R. §§ 404.1520c, 416.920c, apply to Plaintiff's applications for SSI and DIB because they were filed after March 27, 2017.  As relevant here, the regulations provide that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a).[1]  Instead, "[w]hen a medical source provides one or more medical opinions or prior administrative medical findings, [the Commissioner] will consider those medical opinions or prior administrative medical findings from that medical source together using" the following factors "as appropriate": (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant—including its length, purpose, and extent, the frequency of examinations, and whether the medical source actually examined the claimant; (4) specialization; and (5) "other factors that tend to support or contradict a medical opinion or prior administrative medical finding."  *Id*. §§ 404.1520c(a), (c)(1)–(5); 416.920c(a), (c)(1)–(5).  Supportability and consistency are the most important factors the Commissioner is to consider when evaluating a prior administrative medical finding or medical opinion.  *Id*. §§ 404.1520c(a); 416.920c(a).

---

[1] As the Commissioner notes the new regulations define findings as to a medical issue rendered by a State agency consultant at a prior level of review, including a finding as to the RFC, as a "prior administrative medical finding." *See* 20 C.F.R. §§  404.1513(a)(5); 416.913(a)(5).

The Plaintiff challenges the ALJ's adherence to these standards when considering the administrative findings of Drs. Grant and Cohen.[2]  As the ALJ noted, the Plaintiff was evaluated by Drs. Grant and Cohen on November 17, 2017 and April 20, 2018, respectively.  (Tr. 18.)  Dr. Grant diagnosed Plaintiff with major depressive disorder, panic disorder, and mild neurocognitive disorder.  (Tr. 457.)  She also noted that Plaintiff reported that she suffered from obsessive compulsive disorder based on her preoccupation with cleaning and that she has difficulty paying attention for any length of time.  (Tr. 453, 456.)  Based on her interview and examination of the Plaintiff, Dr. Grant determined that the Plaintiff "can follow and understand simple directions and instructions," "may have moderate difficulty doing simple tasks independently," "has significant difficulty maintaining concentration and attention," and may have significant difficulty with "maintaining a regular schedule," "learning a new task," "performing complex tasks independently," and "making appropriate decisions, relating adequately to others, and dealing with stress."  (Tr. 457.)

The ALJ found Dr. Grant's report unpersuasive, as it was based on a one-time examination and Dr. Grant did not have the opportunity to review any of the Plaintiff's treatment records.  (Tr. 20.)  The ALJ further found that Dr. Grant's opinions concerning the moderate or significant difficulty with which Plaintiff could perform certain tasks and functions were phrased in "general terms and do not suggest specific mental residual functional capacity limitation[s]," thus rendering her conclusions unclear.  (Tr. 20.)  In addition, the ALJ noted that Dr. Grant's assessment that Plaintiff would have significant difficulty maintaining a regular schedule was inconsistent with the other medical evidence of record, and that Plaintiff's self-reports of her preoccupation with cleaning and social isolation were not corroborated by her actual treatment records.  (Tr. 18, 20.)

---

[2] The ALJ also found the report of consultative examiner Richard Slutsky, M.D. unpersuasive (Tr. 20), though the Plaintiff does not challenge that determination on appeal.

7

During Dr. Cohen's consultative examination, the Plaintiff reported suffering from depression, mania, negative voices in her head, and an inability to communicate or function; she also described her history of suicidal behavior and her experience of having been sexually assaulted as a nine-year-old child. (Tr. 463–467.) Dr. Cohen diagnosed Plaintiff with bipolar disorder II, mixed, and posttraumatic stress disorder, delayed. (Tr. 467.) He deemed her prognosis "poor" and offered the following medical source statement:

> The clinical symptoms that interfere in her functioning and everyday behavior include extreme labile mood, episodes of crying, migraine headaches, 12 times per month utilizing a strong medication that is injectable, rapid shifting of moods, irritability, psychomotor excitement, difficulty with short-term attention, ruminating thoughts, reports of a history of sexual assault with recurrent thoughts, at times when quite depressed she has auditory command hallucinations in a derogatory nature, and a history of psychiatric hospitalizations and self-mutilation.

(Tr. 468.) As with Dr. Grant's assessment, the ALJ noted that outside of her depression, the symptoms the Plaintiff reported to Dr. Cohen were not documented in her treatment records. (Tr. 18.) The ALJ concluded that if the Plaintiff "actually had the ongoing level of symptoms that she complained of at these one-time consultations, it is reasonable that she would have actually reported similar complaints to her treating sources in efforts to reduce the effects of them." (Tr. 18.) The ALJ also deemed Dr. Cohen's opinion unpersuasive on the grounds that it was a one-time consultation that was inconsistent with the Plaintiff's earlier mental consultative examination or treatment history, that Dr. Cohen did not have the opportunity to review the other medical evidence in the Plaintiff's claim file, and that "[t]he opinion also fails to provide a function-by-function assessment of the claimant's ability to perform in a work setting." (Tr. 20.)

The ALJ instead deemed "[t]he opinions of the State agency physicians and psychological consultants from the initial and reconsideration levels . . . most persuasive," as they were "supported by and consistent with the objective medical evidence of record at the time they were

made, including the three consultative examination reports." (Tr. 19.) Although he did not refer to them by name, the prior administrative findings which the ALJ cited include those of Susan Uber, Ph.D. and Robert Decarli, Psy.D.[3]

In assessing the Plaintiff's mental RFC, Dr. Uber concluded that the Plaintiff was not significantly limited in her ability to remember work-related procedures or locations or in her ability to understand and remember very simple and short instructions, but that she was moderately limited in being able to understand and remember detailed instructions due to her anxiety and mood swings. (Tr. 80, 96.) Dr. Uber determined that Plaintiff was not significantly limited in her ability to: carry out very simple and short instructions; sustain regular attendance, perform activities in accord with a schedule, and be punctual; maintain an ordinary routine without special supervision; and make simple work-related decisions; however she found that she was moderately limited in her ability to: carry out detailed instructions; maintain concentration and attention for extended periods; work in proximity to or in coordination with others without distraction; and complete a normal workday and workweek without disruption from her psychological symptoms or perform at a consistent pace without requiring an unreasonable length and number of rest periods. (Tr. 80–81, 96–97.) In rendering these determinations Dr. Uber noted that the Plaintiff's anxiety, mood fluctuations, and reactivity to her pain and medical conditions might occasionally disrupt optimal productivity but that she retained the capacity to engage in simple tasks on a fulltime basis that do not require intense, sustained focus. (Tr. 81, 97.) As for Plaintiff's social interaction limitations, Dr. Uber found that Plaintiff was not significantly limited in her ability to

---

[3] To the extent the Plaintiff's argument can be construed as challenging the ALJ's failure to articulate, at a minimum, his supportability and consistency findings with respect to the reports of Drs. Uber, Decarli, and those of the other State agency consultants consistent with 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2), the Court's review of the record as a whole leads to the conclusion that such error is harmless, for the reasons discussed, *infra*. It is also clear from the ALJ's citation to the record that these reports were considered in his review of the Plaintiff's claim despite the ALJ's failure to identify or discuss them individually. (*See* Tr. at 19 (citing Exs. 1A; 2A; 5A; 6A).)

9

seek assistance or ask simple questions; accept instructions and respond to criticism from supervisors appropriately; and exhibit appropriate social behavior and comply with basic neatness and cleanliness standards. (Tr. 81, 97.) Dr. Uber noted that the Plaintiff was "[n]ot best suited for work with the public due to social avoidance" and "[m]ay on occasion distract coworkers due to irritability/over-reactivity." (Tr. 81, 97.) Dr. Uber did not deem the Plaintiff to have any adaptation limitations. (Tr. 81, 97.)

On reconsideration, Dr. Decarli reviewed Dr. Uber's findings as well as the reports from Drs. Grant's and Cohen's consultative examinations. Dr. Decarli found that the Plaintiff's reported behavior during her consultation with Dr. Cohen was inconsistent with her earlier consultation with Dr. Grant and with much of the medical evidence of record and that Dr. Cohen's report was therefore unpersuasive. (Tr. 112[4].) Like Dr. Uber, Dr. Decarli found that the Plaintiff's work history "indicates a higher degree of social ability, cognitive ability and appropriateness" than indicated by her self-reports.[5] (Tr. 112.) And despite her self-reported (and at times inconsistent) symptoms, Dr. Decarli noted that the medical record contained no evidence that the Plaintiff received any outpatient treatment as an adult or inpatient treatment for behavioral health, and that the record did not otherwise demonstrate that she participated in any kind of formal psychological

---

[4] Dr. Decarli's opinion is also repeated at pages 115, 128, and 131 of the Administrative Record.

[5] In the Step Three portion of her evaluation, Dr. Uber took cognizance of the results of Dr. Grant's examination but determined that the symptoms and limitations associated with the Plaintiff's mental health disorders did not satisfy any of the diagnostic criteria for the applicable listings. In so finding she observed that the Plaintiff "owned her own nail business from 2009-2017, which is not consistent with the level of impairment described in the [consultative examination]." (Tr. 76, 92.) Dr. Uber further noted that the Plaintiff "has held other jobs for what appears to be a couple years each, including receptionist in a legal office," concluding that "[t]hese types of endeavors require fairly sophisticated social skills, and could not be held by someone with severe cognitive impairment." (Tr. 76, 92.) Dr. Uber therefore observed that Plaintiff "is fairly functionally autonomous" and "retains the capacity, despite her impairments, to work in a simple job," with the limitations set forth in the RFC. (Tr. 76, 92.) The Plaintiff criticizes Drs. Uber's and Decarli's reports for relying upon the Plaintiff's work history to render their medical opinions, when such work history predates her alleged onset date. The Court agrees that the work that the Plaintiff performed prior to the alleged onset date is of marginal probative value to the disability period at issue but does not find that Drs. Uber's and Decarli's brief comments on this issue were so significant as to undermine their overall assessments or the ALJ's decisions to afford them persuasive weight.

treatment as an adult. (Tr. 112.) Dr. Decarli therefore concluded that the Plaintiff "is capable of simple work." (Tr. 112.)

Having reviewed all of the evaluations from the State physicians and consultants that the ALJ considered alongside the consultative examinations and the medical record as a whole, the Court can identify no error in the ALJ's decision to deem the reports of Drs. Grant and Cohen less persuasive. As noted previously, the applicable regulations specify that supportability and consistency are the most important factors for the ALJ to consider when determining the weight to assign to a medical source statement. 20 C.F.R. §§ 404.1520c(a); 416.920c(a). As to supportability the regulations indicate that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. §§ 404.1520c(c)(1); 416.920c(c)(1). Here, neither Dr. Grant's nor Dr. Cohen's opinion cited to or considered objective medical evidence in the record and their evaluations were largely based on the Plaintiff's own reports. As the ALJ noted, there is no objective evidence in the record to confirm the Plaintiff's reports of her obsession with cleaning and auditory hallucinations. (Tr. 18.) Similarly, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. §§ 404.1520c(c)(2); 416.920c(c)(2). Here again, each of Dr. Grant's and Dr. Cohen's opinions appeared to be rendered in a vacuum based on a single examination of the Plaintiff, and without the benefit of the Plaintiff's treatment records. Their opinions are not consistent with the other evidence of record, which is notable for the absence of mental health treatment records which might corroborate the Plaintiff's symptoms or the

consultative examiners' impressions based on a single encounter with the Plaintiff. While the Plaintiff was admitted to the emergency room and discharged the same day in August 2015 (well before her alleged onset date) due to her anxiety (Tr. 500), and while she was prescribed medications by her primary care physicians for anxiety and bipolar disorder (*e.g.*, Tr. 425–26, 484) the ALJ correctly and appropriately noted the lack of evidence of specialized mental health treatment in the Plaintiff's case file. (Tr. 19.) As the ALJ also correctly noted, Dr. Cohen's opinion failed to provide a function-by-function assessment conducive to formulating the RFC, and though Dr. Grant's opinion cited some limitations that bear on the RFC, her assessment was phrased in general terms that tend to obfuscate a more careful RFC determination. (Tr. 20.)

In urging this Court to reach a different result, the Plaintiff asserts that she has had difficulty finding a mental health provider who accepts her insurance. (Pl.'s Mem. at 9–11.) At her hearing the Plaintiff testified in response to the ALJ's question as to why she had not received any treatment since April 2018 that because she obtained her health insurance through the State, she had trouble finding a doctor to treat her bipolar disorder. (Tr. 56–57.) She cites a June 2016 treatment note from her primary care physician, Dr. Adam Messenger, indicating that "Pt is bipolar and would like a referral for a psychiatrist that takes Husky insurance." (Tr. 484.) She also cites a treatment note from September 2017 which indicates that the Plaintiff stopped Depakote (a medication used to treat bipolar disorder) after taking it for seven years and that she "was off insurance for a while just got insurance." (Tr. 426.)

The ALJ, however, considered this issue in determining that the Plaintiff's failure to seek or receive treatment from a mental health professional undermined her claims concerning the severity of her mental health symptoms. (Tr. 19.) The ALJ noted that after requesting a provider that took her insurance, Dr. Messenger referred the Plaintiff to Dr. Linus Abrams and contacted

12

Dr. Abrams to apprise him of the referral. (Tr. 19; *see* Tr. 486.) There is no evidence that the Plaintiff followed up with the referral or otherwise sought mental health treatment. In her memorandum of law the Plaintiff represents that she called Dr. Abrams to make the appointment but was told he does not take Husky insurance, and that he is not included in the current directory of Husky providers published by the State Department of Social Services. (Pl.'s Mem. at 10–11.) She also asserts that the symptoms of her depression, including anhedonia, render it difficult for her to maintain the initiative to pursue appropriate mental health treatment and that the ALJ should have further explored the Plaintiff's reasons for not procuring such treatment. As noted above, however, the ALJ did question the Plaintiff about the gaps in her treatment at her hearing, and the Plaintiff responded that she had not seen her primary care physician since April 2018 "because he automatically refills my medication" and that he was helping her try to find a psychiatrist but she "need[ed] some money." (Tr. 57.)

While the Social Security Ruling that the Plaintiff cites instructs that an ALJ should consider a number of factors including whether an individual can afford treatment in cases in which the frequency or extent of treatment is not compatable with the claimant's subjective complaints, *see Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017), it does not inevitably require the Plaintiff's subjective complaints to fill the gap occasioned by the absence of relevant objective medical evidence when deciding the supportability of a medical opinion. Thus, while the Court is sympathetic to the Plaintiff's stated predicament, she has not cited any authority that persuades the Court that the ALJ committed legal error in these circumstances by citing to the lack of record evidence to sustain the supportability or consistency of Drs. Grant's and Cohen's opinions. Moreover, it bears noting that it is the Plaintiff who carries the burden at Step Four of proving a more restrictive RFC. *See, e.g.*, *Barry*

13

*v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) (summary order) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits").[6]

Finally, the Plaintiff argues that given the absence of mental health treatment records in the Plaintiff's file, "the opinions of Dr. Cohen and Dr. Grant are the primary sources [of] evidence from a mental health specialist"—therefore "[t]here is no competing evidence" to support the ALJ's determination of inconsistency. (Pl.'s Mem. at 14.) She further asserts that the ALJ's decision to discount Dr. Grant's and Dr. Cohen's reports left him without any supportable opinion evidence upon which to base the RFC. (Pl.'s Mem. at 17–18.) The Plaintiff is correct that there is "a large body of case law holding that 'an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error.'" *Staggers v. Colvin*, No. 3:14-CV-717 (JCH), 2015 WL 4751123, at *2 (D. Conn. Aug. 11, 2015) (quoting *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010)). However that is not what happened here, as the ALJ considered the reports of Drs. Grant and Cohen alongside the other medical source statements and assigned them varying degrees of persuasiveness. His decision to accord less value to the assessments of Drs. Grant and Cohen is therefore not the equivalent of rendering an RFC without the benefit of any medical opinion, as the Plaintiff contends.[7]

---

[6] To the extent that the Plaintiff believes that the pursuit of specialized mental health treatment might substantiate her disability claim, the Court observes that the Plaintiff may submit a new application for benefits in light of the ALJ's finding that she has acquired sufficient coverage to remain insured through September 30, 2021. (Tr. 10.)

[7] Plaintiff's argument would not only negate the plausible inference that can be drawn from the absence of corroborating medical records, but would turn that inference on its head by elevating the opinions of the consultative examiners to persuasive simply because the record lacks other relevant evidence. This would be an anomalous result indeed.

Nor is this a situation where the ALJ accorded little or no weight to all medical opinions. *Cf. Kurlan v. Berryhill*, No. 3:18-CV-00062 (MPS), 2019 WL 978817, at *3 (D. Conn. Feb. 28, 2019) ("Because he gave little to no weight to all of the medical opinions, . . . the ALJ had a duty to develop the record and obtain relevant medical opinions before making the RFC assessment"). Instead, the ALJ considered as persuasive evidence the reports of the State agency physicians and psychological consultants, which he was entitled to do.[8] *See, e.g.*, *Major v. Saul*, No. 3:19-CV-01500 (SALM), 2020 WL 5793468, at *12 (D. Conn. Sept. 29, 2020) (rejecting similar argument where "the ALJ assigned some weight to several opinions of record . . . Because the ALJ adopted many of the restrictions set forth in the opinions of the State agency medical and psychological consultants, it is apparent that the weight assigned to those opinions was meaningful. Accordingly, the ALJ did not create an evidentiary gap with his treatment of the medical opinion evidence"); *Caldwell v. Saul*, No. 19-CV-6584L, 2020 WL 6273944, at *3 (W.D.N.Y. Oct. 26, 2020) ("find[ing] no error in the ALJ's discussion and weighing of the medical opinion evidence" where ALJ, *inter alia*, rejected opinion of the plaintiff's consulting examiner "as 'not persuasive,' based on the fact that it appears to have been based on plaintiff's subjective complaint rather than on any examination findings" while deeming opinion of non-examining medical consultant "persuasive"); *cf. West v. Berryhill*, No. 3:17-CV-1997 (MPS), 2019 WL 211138, at *5 (D. Conn. Jan. 16, 2019) (observing, in context of discussing the "treating physician rule" under the prior regulations, that

---

[8] In addition to the opinions of the psychological examiners, Dr. Javier Torres rendered an RFC determination in which he found that Plaintiff could, *inter alia*, occasionally lift and/or carry 20 lbs, frequently lift/and or carry 10 pounds, stand and/or walk for about six hours out of an eight-hour workday, sit for about six hours of an eight-hour work day, occasionally climb ramps or stairs, frequently balance, stoop, and kneel, occasionally crawl and crouch, and never climb ladders, ropes, or scaffolds. (Tr. 77–78, 93–94.) Dr. Torres further determined that the Plaintiff was limited in reaching in any direction and must avoid even moderate exposure to environmental hazards such as machinery and heights, but found that Plaintiff was not otherwise subject to other environmental, visual, or communicative limitations. (Tr. 78–79, Tr. 94–95.) Dr. Darrin Campo reviewed Dr. Torres's findings on reconsideration, which he found to "be corroborated with and supported by" the medical evidence of record. (Tr. 110, 126.)

"the ALJ is entitled to give the opinions of non-examining sources more weight than those of treating or examining sources where there is record evidence to support such a determination.").

In sum, the Court disagrees with the Plaintiff that the ALJ lacked supportable opinion evidence upon which to base his RFC assessment and concludes that the ALJ committed no legal error in assigning less persuasive value to the reports of Dr. Grant and Dr. Cohen.

**Alleged Further Limitations Bearing on the RFC**

The Plaintiff asserts three discrete errors with respect to the ALJ's formulation of the RFC. She first claims that the RFC failed to account for the way that her symptoms require her to be off-task or absent from work above the allowed frequency. At her hearing vocational expert Susan Claudette (the "VE") testified, when questioned by Plaintiff's counsel, that the jobs that a hypothetical individual of the Plaintiff's age and with the Plaintiff's education could perform in light of the stated RFC would be precluded if the "worker in these jobs has an occasional difficulty maintaining concentration and attention for simple tasks," *i.e.*, "up to 30 percent of the workday, or less than that." (Tr. 64.) The VE further testified that the threshold for off-task behavior that would not preclude those jobs is 10 percent of the time or less, and that an employer would only tolerate less than one absence from work per month. (Tr. 65.)

Plaintiff claims that the ALJ should have included the Plaintiff's need to be off-task occasionally, *i.e.*, up to 30 percent of the time, in the RFC based on the opinions of Drs. Uber and Grant, which would have resulted in a finding that she was unable to make a successful adjustment to other work that exists in significant numbers in the national economy. As noted previously, Dr. Uber wrote that Plaintiff's "anxiety/panic as well as her mood fluctuations and reactivity to pain/medical conditions may on occasion disrupt optimal performance and productivity, however she retains the capacity to engage with adequate [concentration, persistence, and pace] in simple

16

tasks that do not demand intense sustained focus, up to physical limits, on a fulltime basis." (Tr. 81.) Given that the Plaintiff's RFC already limits her "to engaging in simple tasks that do not demand intense sustained focus" (Tr. 14), the Court is not persuaded that Dr. Uber's opinion supports a more restrictive RFC when her assessment included, at most, only moderate limitations in certain memory and attention-related functions. *See Roberto v. Saul*, No. 3:18-CV-1651 (WIG), 2019 WL 4261806, at *5 (D. Conn. Sept. 9, 2019) (noting that "courts routinely find that a claimant who has moderate limitations in memory, concentration, and stress management can perform simple, routine, repetitive tasks"). As for Dr. Grant, she opined that the Plaintiff "has significant difficulty maintaining concentration and attention" and "may have significant difficulty maintaining a regular schedule." (Tr. 457.) For the reasons discussed previously, however, the ALJ was entitled to discount Dr. Grant's opinion based on, *inter alia*, its lack of supportability from the other medical evidence of record. *See Major*, 2020 WL 5793468, at *13 ("A plaintiff cannot meet his burden of proving a more restrictive RFC by highlighting evidence the ALJ considered and arguing that it should have been weighed or considered differently") (quotation marks and citation omitted). Plaintiff does not otherwise point to any medical evidence to substantiate her claim that the RFC should have accounted for off-task behavior or absenteeism to the extent that she asserts.

Next, the Plaintiff claims that the ALJ should have limited the Plaintiff to work involving absolutely no coworker contact. She points to the opinion of Dr. Cohen, which cited, *inter alia*, Plaintiff's social anxiety and social isolation (Tr. 464), agitation and labile mood (Tr. 466), and irritability and difficulty with short-term attention. (Tr. 468.) She also cites Dr. Grant's medical source statement, in which she opined that the Plaintiff "may have significant difficulty making appropriate decisions, relating adequately to others, and dealing with stress." (Tr. 457.) The ALJ's

17

RFC determination accounts for these limitations by restricting the Plaintiff "to work that does not involve interaction with the public and only occasional interaction with coworkers and that work does not require teamwork or the collaborative work activities with coworkers." (Tr. 14.) The Plaintiff does not identify any medical evidence in the record suggesting that she is incapable of *any* coworker interaction and she has therefore not satisfied her burden of proving a more restrictive RFC than that formulated by the ALJ.

Finally, the Plaintiff argues that the RFC should have accounted for her need for a cane for stabilization. At her hearing the VE testified that the hypothetical individual of the Plaintiff's age and education and with the Plaintiff's RFC would not be able to perform the jobs identified at the light level if she needed to use a cane for stabilization, and that such a need would further rule out jobs at the sedentary level. (Tr. 63–64.) On this issue, the Plaintiff asserts that the ALJ overlooked evidence, specifically a treatment note from October 14, 2017 from her neurologist, Dr. Evangelos Xistris, who noted that the Plaintiff "[u]ses cane for stabilization." (Tr. 432.) She also points to Dr. Torres's RFC explanation, which cites to Dr. Xistris's same treatment note. (Tr. 80.) The ALJ considered this treatment note, however, but he determined that the Plaintiff's professed need for a cane was "not reflected in any other of the claimant's treatment notes or in Dr. Slutsky's consultative examination report." (Tr. 18.) As the ALJ noted, Dr. Slutsky examined the Plaintiff on May 2, 2018 and observed that her gait was "unremarkable" and she "uses no assistive device;" he further observed that she could "arise on to and off of the examination table as well as from supine to sitting position without difficulty or assistance." (Tr. 471.) The ALJ further noted that a treatment note authored on October 23, 2017 by Dr. Marcus Mayus indicated that she was "ambulating normally" and exhibited "normal gait and station." (Tr. 445–46.) Dr. Xistris's single

note reflecting the Plaintiff's use of a cane is therefore not sufficient to overcome the other substantial evidence that the ALJ relied upon in rendering his decision.

**Conclusion**

For the foregoing reasons, the Plaintiff's motion to reverse is denied and the Commissioner's motion to affirm is granted. The Clerk of the Court is directed to close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 2nd day of April 2021.

                                       */s/ Kari A. Dooley*
                                       KARI A. DOOLEY
                                       UNITED STATES DISTRICT JUDGE